# UNITED STATES DISTRICT COURT
### for the
### District of Colorado

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br><br>TWO ELECTRONIC COMMUNICATION<br>DEVICES FURTHER DESCRIBED IN<br>ATTACHMENT A, CURRENTLY IN THE<br>CUSTODY OF HOMELAND SECURITY<br>INVESTIGATIONS IN GRAND JUNCTION,<br>COLORADO | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)      Case No. 24-sw-1321-RTG |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE "ATTACHMENT A"**, which is attached to and incorporated in this Application and Affidavit

located in District of <u>Colorado</u>, there is now concealed *(identify the person or describe the property to be seized):*

**SEE "ATTACHMENT B"**, which is attached to and incorporated in this Application and Affidavit

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii) | Possession with Intent to Distribute Methamphetamine |

The application is based on these facts:
- ☒ Continued on the attached affidavit, which is incorporated by reference.
- ☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*s/Jeremy Wilson*
*Applicant's signature*

SA Jeremy Wilson, HSI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by <u>telephone</u>.

Date: <u>September 23, 2024</u>

*Richard T. Gurley*
*Judge's signature*

City and state:   <u>Grand Junction, CO</u>

Richard T. Gurley
<u>United States Magistrate Judge</u>
*Printed name and title*

**ATTACHMENT A**

**DESCRIPTION OF LOCATION TO BE SEARCHED**

<u>Subject Device 1</u>



Black Samsung smart phone with unknown IMEI 350207633630840.

<u>Subject Device 2</u>



A black TCL smart phone with an unknown IMEI.

**ATTACHMENT B**

**DESCRIPTION OF ITEMS TO BE SEIZED AND SEARCHED**

For the Device(s) listed and described in Attachment A, the following items, that constitute evidence of the commission of, contraband, the fruits of crime, or instrumentalities of Title 21, United States Code, Section 841(a)(1):

1. Information, notes, software, documents, records, or correspondence, in any format and medium, pertaining to violations of Title 21, United States Code, Section 841(a)(1);

2. Information, notes, software, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to purchasing, possessing, and/or transporting controlled substances;

3. Information, notes, software, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to types, amounts, and prices of controlled substances trafficked, as well as dates, places, and amounts of specific transactions;

4. Photographs and video of associates, property, or other items related to controlled substance, including embedded data within those items;

5. Address books, names, and lists of names and addresses of individuals who may have been contacted by use of the Device(s) or by other means for the purpose of committing violations of Title 21, United States Code, Section 841(a)(1);

6. Stored names, telephone numbers (including numbers from outgoing, incoming, and missed call lists), and e-mail addresses, if applicable; contact lists; records of telephone calls placed, and any other part of the electronic memory of the Device(s) which contains information relating to violations of Title 21, United States Code, Section 841(a)(1);

7. Stored voice-mail, text, and e-mail messages relating to controlled substances;

8. Information, notes, software, documents, records, photographs, videos, or correspondence, identifying or involving controlled substance customers or suppliers;

9. Information, documents, records, photographs, videos, or correspondence, in any format or medium, pertaining to use or ownership of the Device(s), or that aid in the identification of persons involved in violations of Title 21, United States Code, Section 841(a)(1);

10. Information, records, documents, invoices and materials, in any format or medium, that concern any accounts with an Internet Service Provider pertaining to violations of Title 21, United States Code, Section 841(a)(1);

11. Records, in any format or medium, relating to or showing use of any peer-to-peer network, such as You-Tube, Facebook, Twitter, and related social networking pages pertinent to violations of Title 21, United States Code, Section 841(a)(1);

12. Records of Internet activity, including Internet Protocol addresses, firewall logs, transactions with Internet hosting providers, co-located computer systems, cloud computing services, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses pertaining to violations of Title 21, United States Code, Section 841(a)(1), or that show who used, owned, possessed, or controlled the Device(s);

13. Bank records, checks, credit card information, bills, account information, payment records, and other financial records pertaining to violations of Title 21, United States Code, Section 841(a)(1);

14. Records or descriptions of time, date, locations, items, or events showing or tending to show the commission of, or connecting or tending to connect a person to violations of Title 21, United States Code, Section 841(a)(1);

15. Location information, including origin, destination, and any intervening stops, and their associated addresses, pertaining to travel involving violations of Title 21, United States Code, Section 841(a)(1);

16. Evidence of who used, owned, or controlled the Device(s) to commit or facilitate the commission of the crimes described, or at the time the things described in this warrant were created, edited, or deleted, including photographs, videos, logs, call logs, phonebooks, address books, contacts, IP addresses, registry entries, configuration files, saved usernames and passwords, documents, calendars, browsing history, search terms, metadata, user profiles, e-mail, e-mail contacts, messages (text or voice), instant messaging logs, file structure and correspondence;

17. Evidence of software that may allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security provisions or software designed to detect malicious software or unauthorized use of the device, and evidence of the lack of such malicious software;

18. Evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

19.     Evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

20.     Evidence of how and when the Device(s) were used or accessed to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

21.     The telephone number, ESN number, serial number, and/or SIM card numbers of or contained in the Device(s);

22.     Passwords, encryption keys, and other access devices that may be necessary to access the Device(s); and,

23.     Contextual information necessary to understand the evidence described in this attachment.

**<u>DEFINITIONS</u>**:

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## **AFFIDAVIT**

I, Jeremy Wilson, being duly sworn, hereby depose and state that the following is true to the best of my information, knowledge, and belief:

## **INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent (SA) with HSI, United States Department of Homeland Security, and as such I am empowered to enforce Titles 18 and 21 and other criminal laws of the United States, to make arrests and obtain and execute search, seizure, and arrest warrants. I received approximately twenty-seven weeks of criminal investigative training from the Federal Law Enforcement Training Center ("FLETC") and graduated from the Criminal Investigator Training Program (CITP) and HSI Special Agent Training (HSI SAT). Prior to the federal law enforcement career, I was a local police officer seven years in Colorado at Greenwood Village Police Department and Aurora Police Department, including a total of thirty-six weeks of training for Colorado POST certification. As part of my daily duties as an HSI agent, I have the authority to investigate and enforce violations of various titles of the United States Code, to include Title 8 (Aliens and Nationality), Title 18 (Crimes and Criminal Procedure), Title 19 (Customs), Title 21 (Food and Drugs), and Title 31 (Money and Finance).

2. I have conducted and participated in criminal investigations involving complex criminal networks involved in money laundering, smuggling, and drug trafficking violations resulting in arrests and seizures. I am familiar with the methods employed by drug smuggling and money laundering organizations to conduct their business, including, but not limited to: (1) methods of importing and distributing narcotics; (2) transportation routes used for importing and distributing narcotics; and (3) the means

1

of coordinating supply organizations used to smuggle narcotics across the United States border and throughout the country.

3. This affidavit is submitted in support of an application for a search warrant for two cellular phones (more fully described in Attachment A), and the data located therein, there being probable cause to believe that located in the place described in Attachment A are items described in Attachment B, being evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections  841(a)(1) and (b)(1)(A)(ii) – Possession with Intent to Distribute Methamphetamine.

4. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii) are located in the places described in Attachment A.

5. The information contained within the affidavit is based on my training and experience, as well as information imparted to me by other law enforcement officers involved in this investigation.

**IDENTIFICATION OF THE DEVICE(S) TO BE EXAMINED**

6. All items are held in evidence at the HSI Evidence Room in Grand Junction, Colorado, which were discovered in the possession of Alexander REIGHART and Amber HERRICK, that were ultimately seized.  They are all being held in evidence under HSI case number GJ131R24GJ0002.

7.  As pertinent here, the items include a black Samsung smart phone and IMEI
    350207633630840 (hereinafter "Subject Device 1") and a black TCL smart phone with
    three circles on the rear of the device and an unknown IMEI (Subject Device 2), herein
    after "the Subject Devices."

8.  There is probable cause to believe that the Subject Devices are or contain evidence,
    fruits, and instrumentalities of violations of Title 21, United States Code, Sections
    841(a)(1) and (b)(1)(A)(ii).  The applied-for warrant would authorize the forensic
    examination of the devices for the purpose of identifying electronically stored data
    particularly described in Attachment B.

9.  The Subject Devices are currently in the lawful possession of HSI.  They came into
    HSI's possession in the following way:

10. The devices were discovered pursuant to a vehicle stop conducted by a deputy of the
    Mesa County Sheriff's Office who is also a Task Force Officer of HSI in Mesa
    County, Colorado approximately 14 miles east of the Colorado state line. A
    subsequent search of the vehicle yielded approximately 10.8 pounds of
    methamphetamine, 52 fraudulent ID cards, miscellaneous methamphetamine
    paraphernalia, and the Subject Devices.

11. The Subject Devices are currently in storage at the HSI RAC office located at 571
    South Commercial Drive, Grand Junction, CO 81505.  In my training and experience,
    I know that the devices all have been stored in a manner in which the contents are, to
    the extent possible and material to this investigation, in substantially the same state as
    they were when the devices first came into HSI's possession.

3

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

12. Based on my training and experience, I know the following:

13. A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet including websites, social media sites, bulletin boards, file sharing, and other Internet sites. Wireless telephones often have a subscriber identity module or subscriber identification module ("SIM"), which is an integrated circuit that securely stores the International Mobile Subscriber Identity ("IMSI") and the related key used to identify and authenticate subscribers on mobile telephone devices. A SIM is embedded into a removable "SIM card," which can be transferred between different mobile devices. A SIM card contains a unique serial number ("ICCID"), IMSI, security authentication and ciphering information, temporary information related to the local network, a list of the services to which the user has access, and certain passwords. Most SIM cards will also store certain usage

4

data, such as call history, text ("SMS") messages, and phone book contacts.  Wireless telephones may also be "smartphones," such that they operate as personal computers capable of accessing the Internet.  They may also include GPS technology for determining the location of the device.  Such telephones may also contain removable storage media, such as a flash card—such devices can store any digital data, and can have the capacity to store many gigabytes of data.  Some cellular telephones also have software, giving them the same capabilities as personal computers including accessing and editing word processing documents, spreadsheets, and presentations.  Some cellular telephones also operate as a "tablet," or mobile computer, and can contain software programs called applications.  Those programs can perform different functions and save data associated with those functions, including use associated with the Internet.

14. Computers and digital storage devices can include all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptop computers, mobile phones, pagers, tablets, server computers, game consoles, and network hardware and also includes any physical object upon which computer data can be recorded such as hard disk drives, RAM, floppy disks, flash memory, CDs, DVDs, and other magnetic or optical media.

15. Based on my knowledge, training, and experience, I know that computers and digital storage devices can store information for long periods of time.  Similarly, things that have been searched for and viewed via the Internet are typically stored for some period of time on a device.  This information can sometimes be recovered with forensic tools.

16. Based on my knowledge, training, and experience, examining data stored on computers and digital storage devices can uncover, among other things, evidence that reveals or suggests who possessed or used the computer or digital storage devices.

17. There is probable cause to believe that things that were once stored on the devices may still be stored there, for at least the following reasons:

18. Based on my knowledge, training, and experience, I know that digital files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a digital storage device or computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

19. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

20. Wholly apart from user-generated files, computer storage media including digital storage devices and computers' internal hard drives can contain electronic evidence of how a cellular device has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system

6

data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

21. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  Forensic review may also disclose when and by whom the Internet was used to conduct searches, view material, and communicate with others via the Internet.

22. *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information on the devices that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the purpose of the use, who used the devices, and when.  There is probable cause to believe that this forensic electronic evidence might be on the devices because:

23. Data on the storage medium can provide evidence of a file that was once on the storage media but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer or device was in use.  Computer file systems can record information about the dates

files were created and the sequence in which they were created.  This information can be recovered months or even years after they have been downloaded onto the storage medium, deleted, or viewed.

24. A person with appropriate familiarity with how a cellular device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how cellular device were used, the purpose of their use, who used them, and when.

25. The process of identifying the exact electronically stored information on storage media that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a cellular device is evidence may depend on other information stored on the cellular device and the application of knowledge about how a cellular device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

26. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. I know that when an individual uses an electronic device to aid in the commission of a crime, particularly drug trafficking, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training

and experience, I believe that an electronic device used to commit a crime of this type may contain: saved communications providing instructions to the drug courier; names, telephone numbers, e-mail addresses, photographs, social media accounts and messages of co-conspirators; as well as information about how the device was used; data that was sent or received; and other records that indicate the nature of the offense. Additionally, these devices may contain financial account information, financial logbooks, and browser histories.  In my experience, drug couriers make multiple trips. A search of the devices may also provide information on travel history through hotel reservations confirmation e-mails, route searches through websites such as Google Maps, or location information stored by the device itself.

28. I also know that those who engage in criminal activity will attempt to conceal evidence of the activity by hiding files, by renaming the format, (such as saving a .pdf image file as a .doc document file) or by giving them deceptive names such that it is necessary to view the contents of each file to determine what it contains.

29. A single cellular device can store thousands of images and thousands of pages of text, up to a terabyte of electronic data or more.  The size of the electronic storage media (commonly referred to as a hard drive) used in cellular devices has grown tremendously within the last several years. Only with careful laboratory examination of electronic storage devices is it possible to recreate the evidence trail.

30. *Need to review evidence over time and to maintain entirety of evidence.*  I recognize the prudence requisite in reviewing and preserving in its original form only such records applicable to the violations of law described in this Affidavit and in Attachment B in order to prevent unnecessary invasion of privacy and overbroad

searches.  I advise it would be impractical and infeasible for the Government to review the mirrored images of digital devices that are copied as a result of a search warrant issued pursuant to this Application during a single analysis.  I have learned through practical experience that various pieces of evidence retrieved from digital devices in investigations of this sort often have unknown probative value and linkage to other pieces of evidence in the investigation until they are considered within the fluid, active, and ongoing investigation of the whole as it develops.  In other words, the weight of each individual piece of the data fluctuates based upon additional investigative measures undertaken, other documents under review, and incorporation of evidence into a consolidated whole.  Analysis is content-relational, and the importance of any associated data may grow whenever further analysis is performed. The full scope and meaning of the whole of the data is lost if each piece is observed individually, and not in sum.  Due to the interrelation and correlation between pieces of an investigation as that investigation continues, looking at one piece of information may lose its full evidentiary value if it is related to another piece of information, yet its complement is not preserved along with the original.  In the past, I have reviewed activity and data on digital devices pursuant to search warrants in the course of ongoing criminal investigations.  I have learned from that experience, as well as other investigative efforts, that multiple reviews of the data at different times is necessary to understand the full value of the information contained therein, and to determine whether it is within the scope of the items sought in Attachment B.  In order to obtain the full picture and meaning of the data from the information sought in Attachments A and B of this application, the Government would need to maintain access to all of the

resultant data, as the completeness and potential of probative value of the data must be assessed within the full scope of the investigation.  As such, I respectfully request the ability to maintain the whole of the data obtained as a result of the search warrant, and to maintain and to review the data in the control and custody of the Government and law enforcement at times deemed necessary during the investigation, rather than minimize the content to certain communications deemed important at one time.  As with all evidence, the Government will maintain the evidence and mirror images of the evidence in its custody and control, without alteration, amendment, or access by persons unrelated to the investigation.

31. *Nature of examination*.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, copying and reviewing the contents of the devices consistent with the warrant.  The warrant I am applying for would authorize a later examination and perhaps repeated review of the devices or information from a copy of the devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

## INVESTIGATION

32. On April 7, 2022, at approximately 1915 hours, Mesa County Sheriff's Office (MCSO) Deputy and HSI Task Force Officer (TFO) Michael Miller initiated a traffic stop of a gold-colored Honda sedan bearing California plate 8TZJ447 for weaving

onto the shoulder over the exterior lane line which is a violation of Colorado motor vehicle code.

33. This stop occurred at approximately mile marker 14 on Interstate 70, just east of the Colorado port of entry. Upon approaching the Honda, TFO Miller immediately smelled the scent of heavy perfume type odor from within the vehicle. TFO Miller knows this to be a common masking agent to cover up narcotics scents. TFO Miller observed that the Honda was occupied by a male driver, a female passenger in the front seat, and a medium sized dog in the rear seat (another common tactic used to throw of potential law enforcement K9 sniffs). Deputy Miller then noticed a moderate odor of raw marijuana from inside the car as he stood near the window. He asked for and received the driver's license, identifying the driver as Alexander REIGHART (YOB: 1994). REIGHART had immediately asked where a gas station was and said they had been stopped earlier in Utah without being solicited. This is also a tactic to throw off law enforcement in their line of questioning. The passenger when asked about the ownership of the vehicle stated the pair had just acquired the car and were taking it to her cousin but did not provide any specifics of ownership of the car.

34. TFO Miller asked to speak with REIGHART back in his vehicle which he did. TFO Miller ran checks on REIGHART's driving status and waited for the passenger to get the insurance information on her phone. REIGHART still wouldn't elaborate on who the vehicle belonged to, which is another common indicator of contraband smuggling, utilizing a third-party vehicle. REIGHART finally stated it belonged to "Elmyra". REIGHART also could not put together a comprehensive, straight answer as to the pair's reason for travel or destination while speaking to TFO Miller. Based on the odor

12

of marijuana, TFO Miller elected to deploy his Narcotics Detection Dog, "CJ" to conduct a K9 sniff of the Honda. K9 "CJ" alerted to the bottom of the rear passenger door area by sitting as he is trained. TFO Miller then spoke to the passenger, who had found the proof of insurance in her email. TFO Miller asked her what her cousin's name was (the vehicle owner) and she responded, "What's my cousin's name?". This parroting is common for nervous persons or persons who are lying as their brain is trying to stall and think of an answer to the question. She eventually said "Benny" which contradicted REIGHART. TFO Miller had the occupants exit the Honda, along with the dog, and stand in front of it on the shoulder. Prior to the occupants exiting, TFO Miller asked if the occupants had any drugs in the vehicle and they both denied there being any drugs inside.

35. TFO Miller conducted a probable cause search of the vehicle which produced a locked black and white bag behind the front passenger seat. In the bag was a user amount of methamphetamine, a digital scale, syringes, glass smoking pipes, and numerous fake identification cards with both subjects' faces on them with different names. Behind the passenger seat was also a food vacuum sealer, personal use amounts of marijuana, a woman's bra and makeup. In the trunk, TFO Miller found and a locked suitcase that REIGHART stated belonged to the cousin. Inside the suitcase were 3 vacuum sealed bags containing bulk methamphetamine. TFO Miller asked the passenger for her identifiers, and she said, Amber HERRICK (YOB: 1983). She then admitted some of the personal items found near the vacuum sealer on the rear floorboard were hers but denied claiming the vacuum sealer. During the custodial arrest of REIGHART, TFO Miller located a burnt glass smoking pipe, more fake ID cards, and a Samsung smart

phone. While arresting HERRICK, TFO Miller found a TCL smart phone on her person. Special Agent (SA) Jeremy Wilson was present during the stop just after the search was complete and took custody of the cellular devices. All other evidence was transferred to Grand Junction Police Dept.

36. On April 11, 2022, SA Wilson transferred custody of the phones to Mesa County Sheriff's Office for forensic analysis of the devices via state search warrant approved by Mesa County Courts and authored by TFO Miller (Case 202215866 and Judicial Case 22SW269). On April 19, 2022, MCSO Forensic Analyst Logan Waterman began a forensic examination of the devices and attempted to extract digital information for investigative follow up by SA Wilson (Forensic Report 22-7787). SA Wilson retrieved the raw data from MCSO Analyst Waterman and began to review these items. The phones remained at MCSO until SA Wilson returned them to HSI custody on May 6, 2024, following federal acceptance of REIGHART's prosecution.

37. During August 2024, SA Wilson attempted to upload the raw data from the files collected from REIGHART and HERRICK's phones to produce for discovery in the federal case. These files were sent to the defense but were unable to be opened. SA Wilson then attempted to open the files he possesses from both phones and was also unable to open them at his office. The file pathways appear to be broken or corrupted, and no longer access the original data from the phones. SA Wilson is now requesting this search warrant in order to re-obtain the data on both devices to provide for discovery and use during the current federal investigation and prosecution.

38. Based on my training and experience, I know that transporters of large amounts of illegal drugs are usually in constant contact with co-conspirators and distributors at the

14

destination or embarkations of the controlled substance. Communication between transporters, distributors, and co-conspirators are usually maintained through telephone calls or text messages. In my experience, transporters of contraband/currency often do not know their destinations and receive instructions to arrive at the necessary location to deliver the contraband while enroute. Such communications, as well as photographs, documents, and other records, are valuable in aiding investigators in identifying co-conspirators and/or locations containing additional evidence of the offenses.

39. In addition, in my experience, those involved in the trafficking of drugs will use GPS and cell tower-based tracking devices to track the transporters of their narcotics to protect their illicit cargo. Some of these devices send instant details to the user's cell phone or computer so that the whereabouts of their contraband is known at all times. Therefore, the GPS or cell tower-based tracking device would likely contain evidence as to the routes used, locations of stops and telephone numbers associated with the device. Information relating to whom the tracking device/cellular telephone is registered to would lead to evidence showing who was monitoring the trafficked narcotics or conspiring with the courier.

40. Finally, in my experience, computers, including mobile devices, in the possession of drug traffickers often contain information about co-conspirators, including social media accounts and contacts, e-mail accounts and contacts, chats and contacts, photographs, financial accounts, financial logbooks, and browser history. In addition, in my experience, drug couriers often make multiple trips. A search of the computer could provide information on travel history through hotel reservations confirmation e-

mails and route searches through websites such as Google Maps. Financial information related to these activities may aide in identifying others involved in these offenses, as well as provide information on methods and means of transporting or laundering any drug proceeds.

## **ATTORNEY-CLIENT PRIVILEGED MATERIALS**

41.  If the government becomes aware of a reasonable possibility that seized materials may include attorney-client privileged information, the government will implement filter protocols to safeguard attorney-client privileged materials and segregate those materials from review by any member of the investigative team.

## **CONCLUSION**

42. Based on the investigation described above, probable cause exists to believe that stored within the Subject Devices (described on Attachment A), is evidence, fruits, and instrumentalities of a violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(A)(ii) – Possession with Intent to Distribute Methamphetamine (described in Attachment B).

43. I, therefore, respectfully request that the attached warrant be issued authorizing the search and seizure of the items described in Attachment A for the items listed in Attachment B.

//

//

//

//

//

16

I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

__/s Jeremy Wilson_____
Special Agent
Homeland Security Investigations

Submitted, attested to, and acknowledged by reliable electronic means this __20th__ day of September, 2024, Grand Junction, Colorado.

*Richard T. Gurley*
THE HON. RICHARD T. GURLEY
UNITED STATES MAGISTRATE JUDGE

Application for search warrant was reviewed and is submitted by Janelle Surace, Special Assistant United States Attorney.

17